IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

JOSEPH WILSON,                    )
                                  )
     Plaintiff,                   )
                                  )
v.                                )    16-cv-02508-TMP
                                  )
K.T.G. (USA), INC.,               )
                                  )
     Defendant.                   )

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

Before the court is defendant K.T.G. (USA), Inc.'s ("K.T.G.") Motion for Summary Judgment. (ECF No. 32.) Plaintiff Joseph Wilson filed a response in opposition, to which K.T.G. filed a reply. (ECF Nos. 35, 36, 37.) For the following reasons, K.T.G.'s Motion for Summary Judgment is GRANTED in part and DENIED in part.[1]

I.    BACKGROUND

This case arises from allegations that K.T.G. reduced Joseph Wilson's overtime hours, suspended him, and then terminated his employment, all in retaliation for his filing internal grievances and charges with the Equal Employment

_____

[1]The parties have consented to have a United States magistrate judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings. (ECF No. 19.)

Opportunity Commission ("EEOC").  On February 7, 2011, Wilson, who is African-American, started working as a Unitizer/Loader Operator for K.T.G. (Pl's. Resp. to Def's. Statement of Material Facts ("PRDSMF") ¶ 1, ECF No. 36.)  Wilson worked in the Shipping Department of K.T.G.'s paper mill in Memphis, Tennessee, and was represented by the United Steelworkers Local Union No. 9-566. (PRDSMF ¶¶ 1-2.)  According to K.T.G., loaders are required to (1) complete certain documentation during the course of their loading work; (2) record the time they spend unloading product on a Loading Sign-In Log, which allows K.T.G. to track the loaders assigned to each load; (3) complete a Receiving Report once a container is loaded, which is then attached to the shipping manifest and enables K.T.G.'s customers to have accurate information regarding the product that was actually received by the warehouse; and (4) fill out a Productivity Report to document their activities when they are not unloading product from trucks. (PRDSMF ¶¶ 5-12, 15.) According to Anthony Dix's deposition testimony, he informed the Shipping Department employees that they had to complete the Receiving Reports and that failure to do so would result in a performance issue. (PRDSMF ¶ 14.) During Wilson's employment, K.T.G. maintained a Powered Industrial Trucks Policy that prohibited employees from using a cell phone for any purpose while operating a vehicle. (PRDSMF ¶ 18.)  K.T.G. also

maintained an Electronic Equipment Usage Policy that prohibited employees from using personal communication equipment such as cell phones in operating areas during working hours. (PRDSMF ¶ 19.) Wilson disputes K.T.G.'s claims that completion of the Sign-In Logs, Receiving Reports, and Productivity Reports were mandatory requirements for loaders. He also disputes that the Powered Industrial Trucks Policy and the Electronic Equipment Usage Policy were applied uniformly to all employees. (PRDSMF ¶¶ 5-6, 11, 13, 15, 18-19; Gray Decl. ¶ 9.)

K.T.G. has a Progressive Discipline Policy in place with escalating punishment for employee misconduct: for the first instance of misconduct, the employee is orally reprimanded; for the second, the employee receives a written warning; for the third, the employee receives a final written warning and a suspension; and for the fourth, the employee is terminated. (PRDSMF ¶¶ 20-25.) Should the offense be deemed severe, K.T.G. "reserves the right to proceed to any step in the Progressive Discipline Policy." (PRDSMF ¶ 26.) During the first two years of his employment as a loader, Wilson received only one write-up, on September 1, 2011, for violating K.T.G.'s attendance policy. (Record of Discussion, ECF No. 37-6 at 21.)

On February 25, 2013, Anthony Dix, who is also African-American, became Wilson's new supervisor and remained his supervisor until June 24, 2014, the date of Wilson's

termination. (PRDSMF ¶¶ 3-4.) On September 30, 2013, Dix verbally coached Wilson for failing to clean up a product spill and placing pallets in front of the area of the spill, blocking the spill from view. (PRDSMF ¶ 28; Record of Discussion, ECF No. 37-6 at 20.) According to K.T.G., Wilson's infraction came to Dix's attention after several employees complained to Dix that Wilson had stored product in the wrong locations, had damaged product, and had concealed damaged product. (PRDSMF ¶ 29; Dix Dep. 40-41.) According to Wilson, he told Dix that he was not responsible for the product spill, and the employee who had caused the spill was not disciplined. (PRDSMF ¶ 28; Wilson Dep. 203, 210.)

Wilson responded by filing an internal grievance with his union on October 22, 2013 ("October 22 grievance"), in which he stated that Dix had been bullying and harassing him and "has made my job a hostile work environment" based on "my ethic [sic] age." (ECF No. 32-3 at 78-79.) Wilson claimed that Dix had been steadily harassing him, "nit picking" his work performance, and threatening to end his employment "because of he [said] she [said]." (Id.) The grievance did not mention race discrimination or harassment based on race. Dix was aware of this grievance, and in an undated written response, he stated that he had interviewed Wilson and that Wilson "admitted to storing product in an area, which concealed product that had

spilled, even though other employees advised him not to do so. I wrote him up for performance and followed the same guidelines for write ups with other employees." (Dix's Resp. to Wilson's October 22, 2013 Grievance, ECF No. 32-3 at 80.) Wilson disputes Dix's account of this interview, claiming that he did not admit to stacking other product in front of the spill. (PRDSMF ¶ 30.)

On November 5, 2013, Dix issued a written warning to Wilson for talking on his cell phone while loading a truck, in violation of K.T.G.'s Powered Industrial Equipment Policy.[2] (PRDSMF ¶¶ 31-32; Record of Discussion, ECF No. 37-6 at 19.) Wilson claimed that he occasionally used his cell phone at work as a calculator, and that he had dropped his phone and had just picked it up when Dix saw him with it. (PRDSMF ¶ 31.) The next day, on November 6, 2013, Wilson filed a charge of discrimination with the EEOC, Charge No. 490-2014-00128 ("November 6 charge"), in which he alleged as follows:

> Since Anthony Dix became my supervisor he consistently harasses and scrutinizes my work. On October 2, 2013, I received a write up from Dix. On or about October 29, 2013, I filed a grievance concerning Dix's harassing behavior. On November 5, 2013, I received a written-up [sic] from Dix. I believe I have

---

[2]Wilson claims that this incident actually occurred on November 1, 2013, and that he was not written up until November 5, 2013. For purposes of ruling on this motion, the court finds this discrepancy to be immaterial.

been discriminated against because of my race (Black)
and retaliated against in violation of Title VII[.]

(ECF No. 37-4 at 20.)[3]

On November 7, 2013, Wilson filed a second internal
grievance with his union ("November 7 grievance"), in which he
explained that he was holding the phone but was not using it
when Dix saw him with it, and he accused Dix of issuing the
write-up as "harassment" and "retaliation" for the October 22
grievance that he had filed. (ECF No. 32-3 at 81-82.) Dix was
aware of the November 7 grievance, and in an undated written
response to the grievance, he wrote, "[d]uring the ISO Audit I
walked by the dock and noticed Joseph Wilson talking on the
phone while on his lift loading a trailer. . . . I wrote him up
and followed the same process for safety and performance issues
that I use with all employees." (Dix's Resp. to Wilson's
November 7, 2013 Grievance, ECF No. 32-3 at 83.)

Less than one week later, on November 13, 2013, the EEOC
mailed Wilson a letter notifying him of its dismissal of his
November 6 charge and his right to sue. (ECF No. 37-9 at 9.)
Wilson did not file a lawsuit within ninety days of receiving
this right to sue letter. Dix testified that he had no
knowledge of Wilson filing any EEOC charges during the time that

---

[3]The parties do not dispute that Wilson's first grievance was
filed on October 22, 2013, and not October 29 as referenced in
the charge. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 4, ECF
No. 41.)

Wilson was employed by K.T.G. (PRDSMF ¶ 34.) Ann Fleck, the Human Resources Manager at K.T.G., testified at her deposition that she was not aware that Wilson had filed the November 6 charge until she received a copy of the charge in late December 2013 or early January 2014, after she had returned from vacation.[4] (PRDSMF ¶ 35.) Wilson disputes Dix's lack of knowledge regarding his EEOC charge, citing Dix's knowledge of the internal grievances as well as the declaration of one of his co-workers, Michael Gray. In his declaration, Gray states that he was supervised by Dix "during a portion of my employment with the Shipping Department at KTG," he often observed Dix treating employees differently from one another, and after he (Gray) became aware that Wilson had filed a complaint with the EEOC, he "noticed a remarkable difference in the way [Wilson] was treated by Mr. Dix around and after this time." (Gray Decl., ECF No. 37-10 at 1.)

There is some dispute about precisely when Dix next disciplined Wilson. K.T.G. claims that the discipline occurred on December 17, 2013, when Dix reviewed the shipping manifest and the Loading Sign-In Log, and determined that Wilson was responsible for a load that did not have a Receiving Report.

_____

[4]The November 6 charge was addressed to "Joseph Kruger" in Montreal, where Kruger resided, and was subsequently re-routed via inter-company mail to the Human Resources Department. (PRDSMF ¶ 36.)

(PRDSMF ¶ 40.)   According to K.T.G., Dix issued a written warning reprimanding Wilson for failing to complete a Receiving Report on December 9, 2013, and punished him with one day's suspension without pay to take place on December 22, 2013. (Record of Discussion, ECF No. 37-6 at 18; PRDSMF ¶¶ 40, 55-56; Def.'s Resp. Pl.'s Statement of Facts ("DR") ¶¶ 16-17, ECF No. 41 at 16.)   Wilson, on the other hand, claims that Dix reprimanded and suspended him on December 9, 2013, that Dix sent him home that same day without informing him that he was being suspended, that Dix did not complete the necessary paperwork until December 17, and that the suspension lasted for nearly one week. (PRDSMF ¶ 40.)  He also claims that Receiving Reports were not mandatory. (PRDSMF ¶¶ 42-43; Wilson Dep. 195; Gray Decl. ¶ 9.)

Wilson filed a third internal grievance with the union on January 8, 2014 ("January 8 grievance"), in which he stated that he did not know he was supposed to fill out the Receiving Report and that Dix unjustly suspended him.[5]  (ECF No. 32-3 at 84.)  Dix was aware of the January 8 grievance, and in an undated written response, stated that Wilson had been previously told to fill out the Receiving Reports because they were mandatory, that Wilson had completed reports previously and then stopped, and

_____

[5]Although the third grievance is dated December 31, 2013, the grievance was not filed until January 8, 2014, apparently because Dix was on vacation.

that Dix suspended Wilson after learning of the incomplete Receiving Report. (Dix's Resp. to Wilson's January 8, 2014 Grievance, ECF No. 32-3 at 85.)

In January 2014, Fleck became aware through Wilson's then-attorney that Wilson had concerns regarding his suspension and overtime hours. (PRDSMF ¶ 44.) Wilson claimed that he was suspended for not completing a Receiving Report even though his co-workers who similarly had not completed Receiving Reports were not suspended. (PRDSMF ¶ 45.) He also alleged that Dix retaliated against him for filing the November 6 charge by not giving him any overtime work. (PRDSMF ¶ 46.) Wilson claimed that prior to filing the November 6 charge, he worked twenty hours of overtime per week, but after filing the charge, Dix assigned him no overtime work. (PRDSMF ¶ 47.) Fleck investigated Wilson's suspension by reviewing Receiving Reports, the Loading Sign-In Log, time records, and payroll records, and by interviewing Wilson and Dix. (PRDSMF ¶ 48.) Fleck reviewed a Receiving Report that Wilson had completed some four months prior to his suspension. (PRDSMF ¶ 49.) During her investigation, Fleck also verified that Daisie Smith, Celeste Gray, and Karen Phillips, whom Wilson claimed were not completing Receiving Reports, were in fact completing the reports as required. (PRDSMF ¶¶ 51-53.) Smith, Gray, and Phillips are all African-American. (PRDSMF ¶ 52.) Based on her

investigation, Fleck could not corroborate Wilson's allegation that Dix had retaliated or discriminated against Wilson. (PRDSMF ¶ 57.)

Fleck also investigated Wilson's claim of denied overtime. (PRDSMF ¶ 58.) She reviewed Wilson's time card and payroll records, and reviewed time card records and payroll records of the three other loaders who reported to Dix: Albert Harris, Jarmenn Strong, and Karen Phillips, all of whom are African-American. (PRDSMF ¶¶ 60-61.) Wilson, Harris, Strong, and Phillips were scheduled to work in "four on, four off" shifts. This meant that they would work two day shifts from 7:00 a.m. to 7:00 p.m. and two night shifts from 7:00 p.m. to 7:00 a.m., and would then receive four days off. The rotating shifts automatically had overtime "built in." Each shift employee was assigned a relief person. If there was a vacancy, such as a scheduled vacation or other absence that provided an overtime opportunity, the relief person who was currently on their four days off would be assigned overtime. If the relief person did not want the overtime, any qualified employee could sign up for the overtime slot. If an employee did not want his or her assigned overtime and wanted to offer it to other qualified employees, Dix would place a blank line next to each employee's name on a sheet that was placed on the bulletin board to allow other employees to write in their name and to volunteer for the

overtime.   Qualified employees did not have to request this overtime from Dix; they simply signed up for the overtime. Wilson knew that he could sign up to get overtime hours from other employees who did not want to work overtime hours. According to K.T.G., the assignment of overtime was system-driven, and Dix did not have any control over how the overtime was assigned to employees. (PRDSMF ¶ 67.)  According to Wilson, Dix had discretionary authority to assign additional overtime and make the schedule. (PRDSMF ¶ 67.)  Wilson's overtime hours fluctuated from week to week, and he did not have the same number of overtime hours from week to week.   During the approximate three-month period preceding the filing of the November 6 charge, Wilson's overtime hours fluctuated from zero hours to twenty-four hours per work week.   After he filed the November 6 charge, Wilson continued to receive overtime hours, although according to Wilson, the number of hours was substantially less. (PRDSMF ¶¶ 62-76.)

Specifically, the overtime hours that Wilson worked during the August 2013 to December 2013 time period were as follows:

    Pay period ending 8/4/2013 – overtime of 16.38 hours
    Pay period ending 8/11/2013 – overtime of 16.25 hours
    Pay period ending 9/15/2013 – overtime of 24.37 hours
    Pay period ending 9/22/2013 – overtime of 16.67 hours
    Pay period ending 9/29/2013 – overtime of 16.65 hours
    Pay period ending 10/6/2013 – overtime of 25.72 hours
    Pay period ending 10/13/2013 – overtime of 7.83 hours
    Pay period ending 10/20/2013 – overtime of 4.08 hours
    Pay period ending 10/27/2013 – overtime of 4.08 hours

```
Pay period ending 11/10/2013 - overtime of 8.42 hours
Pay period ending 11/17/2013 - overtime of 8.13 hours
Pay period ending 12/8/2013 - overtime of 4.15 hours
Pay period ending 12/15/2013 - overtime of 14.58 hours
```

(Pl.'s Statement of Add'l Material Facts ¶¶ 11-12; Dix Dep. Ex. 8.)[6]  Based on her investigation, Fleck was unable to find any evidence corroborating Wilson's allegation that Dix denied him overtime hours after he filed his November 6 charge.[7] (PRDSMF ¶ 79.)

---

[6]Pay periods during this August to December 2013 time period in which Wilson did not work a full forty-hour work week are not included in this list.

[7]In support of its Motion for Summary Judgment, K.T.G. has filed a declaration signed by Fleck, in which she states that between November 2013 and January 2014, several of the plant's converting lines were down, which meant that converting employees were available to provide coverage to other departments, such as the Shipping Department, on a straight-time basis. (Fleck Decl. ¶ 19.)  The availability of the converting employees during this time period reduced overtime opportunities for employees in the Shipping Department. (Id.)  Additionally, in the year prior to November 6, 2013, one of the shipping employees was on medical leave, which resulted in significantly more opportunities for Wilson and other employees to work overtime.  Upon this employee's return to work, there were less overtime opportunities. (Fleck Decl. ¶ 20.)  Wilson challenges the credibility of Fleck's declaration because she did not discuss these alleged grounds for the reduction in his overtime hours when she was deposed, nor did she offer these additional reasons when she responded to the EEOC's investigation on May 28, 2014.  The court, however, may not make credibility determinations when deciding a summary judgment motion. Therefore, it is appropriate for the court to consider these explanations for the change in Wilson's overtime hours contained in Fleck's declaration.

On March 24, 2014, Wilson filed a second charge with the EEOC, Charge No. 490-2014-00232 ("March 24 charge"), in which he alleged as follows:

> On November 6, 2013, I filed a charge of discrimination with the [EEOC] and the Tennessee Human Rights Commission, alleging race discrimination and retaliation against Kruger USA. (attached) I informed my supervisor that I had filed such charges soon thereafter. Prior to filing my November 6, 2013, Charge of Discrimination with the EEOC/THAA, I was receiving some 20 hours of overtime work per week. However, after my supervisor, Anthony Dix, learned that I had filed my November 6, 2013 Charge of Discrimination, he would not assign me anymore overtime work, although my co-workers continued to receive as much or more overtime work as prior to my filing my EEOC/THAA Charge of Discrimination on November 6, 2013. I believe that I have been denied overtime hours since filing my November 6, 2013 Charge of Discrimination in retaliation for filing such Charges. Mr. Dix has discriminated against me in other ways, including me an [sic] unwarranted unpaid week suspension since he learned about the November 6, 2013, Charge of Discrimination. Since my November 6, 2013, Charge of Discrimination was based on race discrimination and retaliation; I believe I have been discriminated against because of my race (Black) and retaliated in violation of Title VII[.]

(ECF No. 37-9 at 2.) The EEOC mailed Fleck the notice of the March 24 charge on March 27, 2014. (Id. at 1.) On May 28, 2014, K.T.G. mailed a position statement to the EEOC responding to the March 24 charge. (ECF No. 37-5 at 13-17.)

On June 24, 2014, Fleck, Dix, and union representatives met with Wilson to discuss three work incidents that had occurred that month. (PRDSMF ¶ 108.) The first incident occurred on June 9, 2014. (PRDSMF ¶ 111.) According to Dix, on that day, Wilson

unloaded and stacked pallets in an improper manner by stacking the pallets two high in an area where the pallets should have been stacked four high. (PRDSMF ¶¶ 82–87, 111; Dix Dep. 96:11–25, 124:13–25.) Wilson denied stacking the pallets incorrectly and disputed the photographs of the pallets used by Fleck to support the infraction. (PRDSMF ¶ 82; Wilson Dep. 227:10–227:14.) However, Wilson does not dispute that Odie Powell, the Union Shop Steward and Wilson's co-worker, stated he observed Wilson stacking product incorrectly several times, by stacking boxes two high and then stacking boxes in front of the incorrectly stacked product to hide the boxes that he had stacked incorrectly. (PRDSMF ¶ 84; Powell Decl. ¶¶ 4–5, 7.)

The second incident occurred on June 12, 2014. (PRDSMF ¶ 114.) According to Leroy Campbell (Wilson's Team Leader and who is also African-American), Wilson on that day refused to follow orders and did not perform enough hours of work. (PRDSMF ¶¶ 88–92; Campbell Decl. ¶¶ 5–16, ECF No. 32-3 at 306–07.) Specifically, Campbell reported that he had asked Wilson to unload a trailer and that Wilson refused, stating that he was going on break. (PRDSMF ¶ 90.) After returning from break, Wilson did not perform any other work and instead drove around and spoke to co-workers until his shift ended. (PRDSMF ¶ 92.) Dix reviewed the Loading Sign-In Log and reported to Fleck that the log showed Wilson only performed three hours and 50 minutes

of work during his eight-hour shift on June 12. (PRDSMF ¶ 95.)
On June 18, 2014, Fleck met with Campbell in person as part of
her investigation regarding his complaint. (PRDSMF ¶ 96.)  In
addition to the information discussed above, Campbell told Fleck
that on June 12, he did not know where Wilson was for "a couple
of hours" after his first load, and when Campbell later saw him
and asked where he had been, Wilson did not respond. (PRDSMF ¶
99.) Wilson asserts that he had taken an authorized break and
that he had performed more work on that day than what Campbell
conveyed to Fleck.  However, he does not dispute that the logs
showed he unloaded trucks for a total of three hours and 50
minutes. (PRDSMF ¶¶ 93, 95; Wilson Dep. 229:19–230:2.)

The third incident occurred on June 23, 2014. (PRDSMF ¶
119; Fleck Decl. ¶ 31, ECF No. 32-3 at 145-49.)  According to
"converting leadership," on that day Wilson was observed in the
break room at 6:00 a.m. not doing any work, and when he was
instructed to get back to work, he "disappeared." (PRDSMF ¶ 119;
Fleck Decl. ¶ 31.)  Wilson does not dispute this claim.  Fleck
later met with General Manager Fred Ceruti, who is African-
American, to review the findings of her investigation regarding
Wilson's performance problems.  Ceruti delegated to her the
authority to make the final decision regarding Wilson's
termination. (PRDSMF ¶ 105.)  According to K.T.G., any one of
these violations could have resulted in Wilson's termination

because he was at the final written warning step and one infraction away from termination. (PRDSMF ¶ 120.)

At the June 24 meeting, Fleck, instead of terminating Wilson for these workplace violations, offered him the opportunity to sign a "last chance" agreement, which would have allowed Wilson to keep his job. (PRDSMF ¶¶ 123-126; Wilson Dep. 253:4-253:22.) Wilson refused to sign the agreement because he did not agree with how it characterized his conduct. (PRDSMF ¶¶ 124-127; Wilson Dep. 125:12-125:24.) K.T.G. terminated his employment on that same day. (PRDSMF ¶ 129.) Wilson was replaced by Howard Cosby, who is African-American. (PRDSMF ¶ 133.)

On June 26, 2014, Wilson amended his second EEOC charge to include a claim that his termination was also in retaliation for his November 6 charge. (ECF No. 37-6 at 14.) The EEOC issued Wilson another right to sue letter, and on June 24, 2016, he filed the instant lawsuit against K.T.G. under Title VII of the Civil Rights Act of 1964. (ECF No. 1 at 1, 6.) He initially raised Title VII claims of racial discrimination and retaliation in the form of overtime reduction, suspension, and termination. However, Wilson has since voluntarily dismissed the racial discrimination claim, leaving only the retaliation claims. (Pl's. Resp. 1 n.1, ECF No. 35.) K.T.G. now moves for summary judgment.

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When assessing whether to grant summary judgment, a judge "may not 'make credibility determinations or weigh the evidence,' because those are 'jury functions.'" Jordan v. Kohl's Dep't Stores, Inc., 490 F. App'x 738, 741 (6th Cir. 2012) (citation omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Instead, the judge must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Block v. Meharry Med. Coll., 723 F. App'x 273, 277 (6th Cir. 2018) (quoting Anderson, 477 U.S. at 251-52). "In resolving a summary judgment motion, th[e] court must view the evidence in the light most favorable to [the nonmovant]." Huckaby v. Priest, 636 F.3d 211, 216 (6th Cir. 2011) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Title VII prohibits employers from "discriminat[ing] against . . . [an employee] . . . because [the employee] has opposed any . . . unlawful employment practice . . . or because

[the employee] has made a charge" that the employer has engaged in an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment[.]" 42 U.S.C. § 2000e-2(a)(1). "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning, . . . '[t]o resist or antagonize [. . .]; to contend against; to confront; resist; withstand.'" Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1957)). "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (citing Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 F. App'x 651, 655 (6th Cir. 2012)).

A Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 538 (6th Cir. 2008). "Direct evidence is that evidence

which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." Id. at 543-44 (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003); Christopher v. Stouder Mem'l Hosp., 936 F.2d 870, 879 (6th Cir. 1991)). Because Wilson does not have direct evidence of retaliation and instead relies only upon circumstantial evidence, the McDonnell Douglas framework applies. Jordan, 490 F. App'x at 742.

Under McDonnell Douglas, Wilson bears the initial burden of establishing a *prima facie* case of retaliation by showing (1) he engaged in a protected activity, (2) K.T.G. knew about the protected activity, (3) K.T.G. subsequently acted in a manner that was "materially adverse" to him, and (4) there was a causal connection between his protected activity and K.T.G.'s materially adverse act. Laster, 746 F.3d at 730 (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006))). "The Supreme Court in Burlington Northern . . . made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." Hawkins v. Anheuser–Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008). "In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely

affect the terms, conditions or status of employment, or only those acts that occur at the workplace." Id. (citing Burlington N., 548 U.S. at 64). "The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington N., 548 U.S. at 68); see also Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013) ("Further, the Supreme Court has recognized that actions typically construed as nonmaterial could rise to the level of an adverse employment action when considered in context[.]"). With regard to the causation prong, Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2012).

If Wilson meets his *prima facie* case requirement, "the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision." Melton v. U.S. Dep't of Labor, 373 F. App'x 572, 576 (6th Cir. 2010) (quoting Yellow Freight Sys., Inc. v. Reich, 27 F.3d 1133, 1138 (6th Cir. 1994)). Should K.T.G. provide such a reason, Wilson must then show that K.T.G.'s reason was pretextual. See O'Donnell v. City of Cleveland, 838 F.3d 718,

726–27 (6th Cir. 2016).  To raise a genuine issue of fact as to pretext, a plaintiff must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate the defendant's action, or (3) the proffered reason was insufficient to motivate the action. Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 589 (6th Cir. 2002).  Wilson can defeat summary judgment only if his evidence is sufficient to "create a genuine dispute at each stage of the McDonnell-Douglas inquiry." Macy v. Hopkins Cty. Sch. Bd. of Educ., 484 F.3d 357, 364 (6th Cir. 2007) (internal quotations and citations omitted). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

## B.    Retaliation Based on October 22 Grievance

As an initial matter, K.T.G. argues that Wilson cannot rely upon his October 22 grievance as a basis for any of his retaliation claims.  K.T.G. contends that any such claim would be time barred because the October 22 grievance was raised in the November 6 charge, the EEOC sent Wilson his right to sue letter on this charge on November 13, 2013, he had ninety days to file a lawsuit based on that charge, and he did not file the present lawsuit until June 24, 2016.

A plaintiff must first exhaust administrative remedies before filing a discrimination lawsuit under Title VII in

federal court. <u>Randolph v. Ohio Dep't of Youth Servs.</u>, 453 F.3d 724, 731 (6th Cir. 2006). In order to satisfy this exhaustion requirement, the plaintiff must first file a charge of discrimination before the EEOC or corresponding state agency. <u>Amini v. Oberlin Coll.</u>, 259 F.3d 493, 498 (6th Cir. 2001). If the EEOC elects not to prosecute the plaintiff's discrimination charge, it must issue a notice of right to sue to the plaintiff. 29 C.F.R. § 1601.28(b). Upon receipt of the notice of right to sue, the plaintiff has ninety days in which to bring a federal action alleging a violation of Title VII. 42 U.S.C. § 2000e-5(f)(1). This ninety-day requirement is a timing requirement similar to a statute of limitations and serves as a bar to the plaintiff's lawsuit when the complaint is not timely filed. <u>Truitt v. Cty. of Wayne</u>, 148 F.3d 644, 646-47 (6th Cir. 1998).

A complaint in a Title VII case is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." <u>Tipler v. E. I. duPont deNemours & Co.</u>, 443 F.2d 125, 131 (6th Cir. 1971). This means that a plaintiff may bring a lawsuit for a claim that was not explicitly alleged in an EEOC charge only if the "facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim." <u>Spengler v. Worthington Cylinders</u>, 615 F.3d 481, 490 (6th Cir. 2010)

(quoting _Weigel v. Baptist Hosp. of E. Tenn._, 302 F.3d 367, 380 (6th Cir. 2002)).

The November 6 charge alleged that Dix had engaged in racial discrimination and retaliation based on the filing of Wilson's October 22 grievance (erroneously identified in the charge as being filed on October 29). However, the charge made no reference to a reduction or denial of overtime hours, which is not surprising given the brief two-week time period between the filings of the October 22 grievance and the November 6 charge. In his November 7 grievance, Wilson made no mention of denial of overtimes hours, and instead focused on Dix writing him up for the cell phone policy infraction as the retaliatory conduct, further indicating that Wilson was not alleging denial of overtime hours when he filed his November 6 charge. And, the suspension in December (obviously) had not yet occurred when he filed the November 6 charge, and therefore Wilson could not have alleged that the suspension was in retaliation for the October 22 grievance until he later filed his March 24 charge. Based on the narrow scope of the allegations in the November 6 charge, the court finds that the retaliation claims that stem from the filing of the October 22 grievance are not time barred.

K.T.G. also argues that Wilson cannot claim Dix retaliated against him for filing the October 22 grievance because the March 24 charge repeatedly claimed that Dix denied Wilson

overtime hours and suspended him specifically in retaliation for filing the November 6 charge, without ever mentioning the October 22 grievance. The court disagrees with K.T.G.'s overly restrictive reading of the March 24 charge. While the March 24 charge did not reference the October 22 grievance, the November 6 charge did, and as a result, the EEOC investigation into the March 24 charge would reasonably have been expected to include Wilson's reason for filing the November 6 charge, i.e., the October 22 grievance. The requirement that an EEOC charge have a certain level of specificity "serves to put employers on notice and gives the EEOC the opportunity to investigate or settle the dispute." <u>Golden v. Mirabile Inv. Corp.</u>, 724 F. App'x 441, 445 (6th Cir. 2018). K.T.G. was aware of the October 22 grievance when it was filed, Dix submitted a written response to the grievance, and the November 6 charge and November 7 grievance both referenced Dix's alleged retaliation based on the October 22 grievance. Thus, a retaliation claim based on the October 22 grievance could reasonably have been expected to grow out of the March 24 charge, and as a result, the court finds that Wilson may bring his retaliation claims based on the filing of the October 22 grievance.

**C.** ***Prima Facie* Case**

    1. <u>Protected activity</u>

K.T.G. does not dispute that the filing of EEOC charges and internal grievances qualify as protected activities. Therefore, Wilson has satisfied the first prong of his *prima facie* case.

## 2.   Knowledge of the protected activity

As to the second prong, whether K.T.G. knew about the protected activity, K.T.G. concedes that it (through Dix) knew about the three grievances at around the time they were filed. However, Dix testified that he did not know that Wilson had filed either of the EEOC charges until after Wilson's employment was terminated, and Fleck testified that she did not learn about the November 6 charge until sometime in late December 2013 or early January 2014. Based on this testimony, K.T.G. argues that Wilson cannot rely upon the November 6 charge as a protected activity to support his claims of retaliation for the reduction in overtime hours and his suspension in December 2013. In response, Wilson argues that Dix must have known about the November 6 EEOC charge because he was aware of the multiple grievances that had been filed and Wilson noticed "increased scrutiny" from Dix after the charge was filed. Wilson also cites to the Gray declaration, which states that Gray noticed "a remarkable difference in the way [Wilson] was treated by Mr. Dix around and after" the time that Gray learned Wilson had filed an EEOC charge. (Gray Decl. ¶ 8.) Gray's two-sentence declaration on this point, however, is completely lacking in important

factual details, and in any event, his generalized observations regarding how Dix treated Wilson fall well short of creating a triable issue on whether Dix knew about the EEOC charge. Wilson's assertion that Dix's knowledge of the charge can be inferred from his increased scrutiny of Wilson is speculative, at best.  No reasonable jury could find that Dix or Fleck knew about the November 6 charge before Wilson's alleged reduction in overtime hours and his suspension.[8]  See Vander Boegh v. EnergySolutions, Inc., 536 F. App'x 522, 530 (6th Cir. 2013) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.") (quoting Frazier v. USF Holland, Inc., 250 F. App'x 142, 148 (6th Cir. 2007)).

    3.   <u>Materially adverse action</u>

K.T.G. concedes that Wilson's suspension in December 2013, regardless of whether it was for one day or one week, qualifies as a materially adverse action.  However, it contends that Wilson fails to meet the third prong of his *prima facie case* with regard to his refusal to sign the last chance agreement (which resulted in his termination) and to the reduction in overtime hours.

---

[8]Because Fleck eventually became aware of the November 6 charge, and she was the decisionmaker who terminated Wilson, the November 6 charge qualifies as a protected activity for purposes of Wilson's claim of retaliatory termination.

With respect to its first argument, K.T.G. argues that it did not subject Wilson to a materially adverse action because Wilson, by refusing to sign the last chance agreement, "effectively ended his own employment." (Def's. Mot. Summ. J. 19, ECF No. 32-1.) In the context of Title VII retaliation claims, materially adverse acts are those that "might well deter a reasonable employee from complaining about discrimination." Laster, 746 F.3d at 731 (quoting Burlington N., 548 U.S. at 69). Under the present facts, a reasonable jury could find that by presenting Wilson with the last chance agreement, particularly one that Wilson claims contained inaccurate facts, K.T.G. engaged in conduct that might deter a reasonable employee from complaining about discrimination. See Jackson v. SelectTech Servs. Corp., No. 3:09-CV-245, 2012 WL 252728, at *12 n.8 (S.D. Ohio Jan. 26, 2012) ("Threats of termination and 'last chance' agreements that move an employee decidedly closer to termination could very well dissuade a reasonable employee from making a charge of discrimination."); Coleman v. Bronson Methodist Hosp., No. 4:05-CV-141, 2006 WL 3391404, at *7, *11 (W.D. Mich. Nov. 21, 2006) (finding that it was a materially adverse act to terminate an employee who refused to sign a last chance agreement); Miller v. Rudd, No. C2-97-317, 2001 WL 242588, at *6, *18 (S.D. Ohio Feb. 6, 2001) (same). Thus, Wilson has

satisfied the third prong of his *prima facie* case as to his retaliatory termination claim.

K.T.G.'s second argument presents a closer question. It is undisputed that Wilson's overtime hours fluctuated from week to week, and that prior to the filing of the grievances in late October and early November, Wilson's payroll records show weeks in which he received no overtime hours. However, it also appears from his payroll records that the weeks in which he received no overtime hours were weeks where he worked less than a full forty hours. From May through the middle of October 2013, Wilson's overtime hours (excluding the weeks where he worked less than forty hours) ranged from about sixteen hours to twenty-four hours each week. From the middle of October through the end of December 2013, his overtime hours (excluding the weeks where he worked less than forty hours) ranged from about four hours to eight hours each week. Based on this evidence, which the court views in the light most favorable to Wilson, the court finds that he has satisfied the third prong of his *prima facie* case as to his reduction in overtime retaliation claim.

4.   Causation

K.T.G. asserts that Wilson's retaliation claims fail to meet the "but-for" causation requirement of the *prima facie* case. In order to satisfy this requirement, Wilson must provide sufficient evidence for a reasonable jury to infer that the

filing of his grievances was the but-for cause for Dix reducing his overtime hours and suspending him, and that those grievances or the EEOC charges were the but-for cause for Fleck's decision to terminate his employment.[9] See Amos v. McNairy Cty., 622 F. App'x 529, 537 (6th Cir. 2015).

The court finds that the evidence, viewed in the light most favorable to Wilson, satisfies the causation prong for the retaliatory suspension claim. During his first two years of employment, Wilson received only one write-up, on September 1, 2011, for violating the attendance policy. During the first seven months of Dix's supervision of Wilson, Wilson did not receive any warnings or infractions until the September 30 product spill infraction. Less than two weeks after Wilson filed his October 22 grievance, Dix wrote him up for the cell phone infraction, and about one month after Wilson filed his November 7 grievance, Dix suspended him for the Receiving Report

---

[9]The Nassar "but-for" standard has been applied as a *prima facie* element in several unpublished Sixth Circuit decisions and district court cases. See, e.g., Goodsite v. Norfolk S. Ry. Co., 573 F. App'x 572, 582-84 (6th Cir. 2014); Beard v. AAA Mich., 593 F. App'x 447, 450-52 (6th Cir. 2014); Greene v. U.S. Dep't of Veteran Affairs, 605 F. App'x 501, 504-06 (6th Cir. 2015); Williams v. Serra Chevrolet Auto., LLC, 4 F. Supp. 3d 865, 867, 877-80 (E.D. Mich. 2014); McQuail v. Tenn. Tech. Univ., 69 F. Supp. 3d 701, 714 (M.D. Tenn. 2014); Taylor v. Donohoe, 66 F.3d 993, 1001, 1004 (W.D. Tenn. 2014); Van Buren v. Ohio Dep't of Public Safety, 996 F. Supp. 2d 648, 666-67 (S.D. Ohio 2014); see also Wright v. St. Vincent Hosp. Sys., 730 F.3d 732, 738 n.5 (8th Cir. 2013); Carlson v. CSX Transp., Inc., 758 F.3d 819, 828 n.1 (7th Cir. 2014); Verma v. Univ. of Penn., 533 F. App'x 113, 119 (3d Cir. 2013).

infraction. Wilson has offered at least some evidence disputing K.T.G.'s claim that the Receiving Reports were mandatory, including his own testimony as well as Gray's declaration. Wilson further relies upon the fact that the single Receiving Report that K.T.G. used to infer that Wilson was aware of the mandatory nature of Receiving Reports was filled out by Wilson some four months earlier, which Wilson argues demonstrates that the reports were only sporadically required. From this evidence, a reasonable jury could find that Wilson has satisfied the but-for causation prong of his *prima facie* case.

The court also finds that with regard to his retaliatory termination claim, a reasonable jury could find that Wilson has satisfied the causation prong of his *prima facie* case. By January 2014, Fleck learned that Wilson had filed the November 6 charge with the EEOC and that he had hired an attorney to contest his alleged denial of overtime hours and suspension. After Fleck informed Wilson that she had conducted an investigation and could not corroborate Wilson's allegations, Wilson filed a second EEOC charge on March 24, which K.T.G. responded to on May 28. One month later, on June 24, 2014, Fleck met with Wilson, Dix, and union representatives to discuss Wilson's three infractions that had occurred earlier that same month, and at the conclusion of the meeting, Fleck terminated Wilson's employment. The Sixth Circuit "has embraced the

premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." <u>Seeger v. Cincinnatti Bell Telephone Co., LLC</u>, 681 F.3d 274, 283 (6th Cir. 2012) (quoting <u>DiCarlo v. Potter</u>, 358 F.3d 408, 421 (6th Cir. 2004)). Based on this sequence of events and the temporal proximity, Wilson has met the but-for causation prong of his claim of retaliatory termination.

However, with regard to the reduction in overtime claim, no reasonable jury could find that Wilson has met his burden to show causation. The evidence shows that Wilson and other loaders in his department worked rotating shifts that automatically had overtime "built in." The relief person assigned to each shift would be assigned overtime, and if the relief person did not want the overtime, any qualified employee could sign up for the slot. If an employee did not want his or her assigned overtime, Dix would place a blank line next to each employee's name on a sheet that was placed on the bulletin board to allow other employees to sign up for overtime. Qualified employees did not have to request this overtime from Dix; they simply signed up for the overtime. Wilson knew that he could sign up to get overtime hours from other employees who did not

want to work overtime hours. Although Wilson has presented some evidence to suggest that Dix had discretionary authority to assign additional overtime and approve schedule changes (see Wilson Dep. 152; Gray Decl. ¶ 7), Wilson has not presented any evidence that Dix on any occasion denied Wilson overtime hours, that Dix was responsible for assigning other employees overtime hours that could have gone to Wilson during any particular pay period, or that Dix changed anyone's schedule that had the effect of reducing Wilson's overtime opportunities. Wilson has not presented any evidence that Dix took steps to cut his overtime hours or that he (Wilson) ever put in for overtime and was denied.

The same payroll records that Wilson relies upon to show that his overtime hours were reduced in November and December 2013 also show that for the two pay periods *before* he filed his October 22 grievance, he received only 7.83 hours and 4.08 hours of overtime, which was down from the sixteen to twenty-four hours of overtime he earned in the weeks leading up to the beginning of October 2013. Thus, to the extent Wilson relies upon temporal proximity to support his claim, the fact that he received reduced overtime hours prior to the filing of the October 22 grievance cuts against a finding of causation. Moreover, according to Fleck's declaration, between November 2013 and January 2014, overtime opportunities were reduced for

Shipping Department employees because converting employees were available to provide coverage on a straight-time basis. Also, in the year prior to November 6, 2013, one of the shipping employees was on medical leave, which resulted in significantly more opportunities for Wilson and other employees to work overtime. Upon this employee's return to work, there were less overtime opportunities. Because no reasonable jury could find from this evidence that Wilson has satisfied the causation requirement of his *prima facie* case as to his reduction in overtime retaliation claim, K.T.G. is entitled to summary judgment on this claim.

**D.    Non-retaliatory Reasons**

The court next must determine whether K.T.G. has presented sufficient evidence from which a reasonable jury could conclude that K.T.G. had a legitimate, non-retaliatory reason for its suspension and termination decisions. K.T.G. has satisfied its burden as to both claims. Regarding the suspension decision, K.T.G. has presented evidence that Dix found Wilson using his cell phone at work and that Wilson did not complete a Receiving Report, both violations of K.T.G. policies. Regarding the termination decision, K.T.G. has presented evidence that it terminated Wilson after Fleck conducted an investigation and found that Wilson had improperly stacked pallets of product, failed to follow work orders, and failed to undertake work for

his entire shift, all violations of K.T.G.'s policies and grounds for termination pursuant to its Progressive Discipline Policy. While Wilson denies that he was talking on his cell phone at the time Dix saw him with it, denies that Receiving Reports were mandatory, and disputes the evidence of improper pallet stacking relied upon by Fleck, K.T.G. has presented ample evidence of non-retaliatory reasons to justify its employment decisions at this second stage of the McDonnell Douglas analysis.

**E. Pretext**

Based on the sufficiency of K.T.G.'s evidence of non-retaliatory reasons, the burden shifts to Wilson to present sufficient evidence from which a reasonable jury could conclude that K.T.G.'s proffered reasons are mere pretext for retaliation. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her *prima facie* case is sufficient to support an inference of discrimination at trial." Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 508 (6th Cir. 2014) (citing Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" Seeger, 681 F.3d at 285 (quoting

Donald v. Sybra, Inc., 667 F.3d 757, 763 (6th Cir. 2012)). "However, 'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" Id. (quoting Bell v. Prefix, Inc., 321 F. App'x 423, 431 (6th Cir. 2009)).

The first potential theory to attack the credibility of the defendant's articulated reason for its actions requires that the proffered reason lack a factual basis. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds, Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009). This first "showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false." Id. (internal quotations omitted). The second theory, that the proffered reason did not actually motivate the defendant's action, requires that "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such *conduct* could motivate dismissal." Id. (emphasis in original). The second showing constitutes an indirect attack on the proffered reason where "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." Id. (emphasis in original). Like the first theory, the third

theory is a direct attack that "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Id. "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [] intentionally discriminated against him." Seeger, 681 F.3d at 285 (alterations in original) (quoting Clark v. Walgreen Co., 424 F. App'x 467, 474 (6th Cir. 2011) (per curiam) (citation and internal quotation marks omitted)).

In arguing that Wilson has failed to prove pretext, K.T.G. invokes the honest belief rule. The honest belief rule provides that "as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." Ferrari v. Ford Motor Co., 826 F.3d 885, 895 (6th Cir. 2016). To prove a belief is honestly held, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." Id. at 896 (internal quotation and citation omitted).

"[T]he honest belief rule only applies when a plaintiff is proceeding solely on the basis that the proffered reason has no basis in fact." <u>Hawthorne v. Univ. of Tenn. Health Sci. Ctr.</u>, 203 F. Supp. 3d 886, 892 n.4 (E.D. Tenn. 2016). "If . . . a plaintiff argues that the proffered reasons did not actually motivate the termination or was insufficient to motivate the termination, the honest belief rule has no application." <u>Id.</u> In response to K.T.G.'s reliance on the honest belief rule, Wilson argues that the rule does not apply in this case because his pretext arguments are based solely on the second and third theories – that K.T.G.'s proffered reasons did not actually motivate the employment decisions and were insufficient to motivate those decisions. (<u>See</u> Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 17.) Because Wilson has expressly renounced any reliance on the first theory – the "no basis in fact" theory - the honest belief rule does not apply.

The court will therefore focus its attention on the second and third pretext arguments. Under the second pretext theory, a plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal[.]" <u>Hedrick v. Western Reserve Care System</u>, 355 F.3d 444, 461 (6th Cir. 2004) (internal quotation and citation omitted). Regarding the retaliatory suspension, the court finds that Wilson has presented sufficient evidence from

which a reasonable jury could find that K.T.G.'s stated reasons for suspending him are pretext for unlawful retaliation. As discussed above, during his first two years of employment, Wilson was written up only once, for violating the attendance policy, and during the first seven months of Dix's supervision of Wilson, Wilson did not receive any warnings or infractions until the September 30 product spill infraction. Less than two weeks after Wilson filed his October 22 grievance, Dix wrote him up for the cell phone infraction, and about one month after Wilson filed his November 7 grievance, Dix suspended him for the Receiving Report infraction. Wilson does not dispute K.T.G.'s claim that he did not complete the Receiving Report, but he has offered at least some evidence disputing K.T.G.'s assertion that the Receiving Reports were mandatory and suggesting that the reports were only sporadically required. From this evidence, a reasonable jury could conclude that Dix wrote up Wilson and then suspended him because he had filed the grievances against Dix accusing him of discrimination and retaliation.

Regarding the retaliatory termination, however, the court finds that Wilson has not presented sufficient evidence from which a reasonable jury could find pretext. Wilson takes issue with the photographs of the pallets and other evidence used in the investigation of the June 9 infraction, but he offers no evidence to create a genuine dispute regarding his failure to

follow work orders and failure to undertake work for his entire shift on June 12, and his "disappearing" after being told to get back to work by converting leadership on June 23. Wilson concedes that any of these violations of K.T.G.'s policies would have been grounds for termination pursuant to the Progressive Discipline Policy, since he had previously received a verbal coaching and two write-ups leading up to the June 2014 series of infractions. Fleck made the decision to terminate Wilson's employment only after she conducted her investigation and after he declined the last chance agreement. Temporal proximity at the pretext stage is not enough to prove pretext. See Seeger, 681 F.3d at 285.

Wilson's reliance on the third pretext theory does not save his retaliatory termination claim. This showing is a direct attack that consists of evidence that other employees, particularly employees not in the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff. Wilson has not presented any evidence regarding how other similarly-situated employees were treated who committed the same series of infractions that he allegedly committed in June 2014. Therefore, K.T.G. is entitled to summary judgment on Wilson's retaliatory termination claim.

### III. CONCLUSION

For the reasons above, K.T.G.'s Motion for Summary Judgment is GRANTED as to the retaliation claims based on a reduction in overtime and termination, and DENIED as to the retaliation claim based on his December suspension.

IT IS SO ORDERED.

s/ Tu M. Pham
_____
TU M. PHAM
United States Magistrate Judge

September 24, 2018
_____
Date